| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>)<br>ROBERT L. SHULL, )<br>TERRY L. SHULL )<br>)<br>Defendants. )<br>) | Criminal No.<br>10-CR-10314-GAO |

**DEFENDANT'S SENTENCING MEMORANDUM**

Robert Shull submits this memorandum as an aid to the court in sentencing.

The Rule 11(c)(1) (C) plea agreement recommends a sentence of imprisonment for one day followed by 6 months of supervised release with a special condition of community confinement, a $75,000 fine, and $100 special assessment. The agreement was signed on September 30, 2010. Mr. Shull urges this Court to reduce the period of supervised release and community confinement for the following reasons.

**I.   POST-PLEA AGREEMENT LIBERTY LOSSES.**

After the plea agreement was signed, Mr. Shull was imprisoned for 12 days in Canada and the U.S. during the process of being extradited to await transfer to the custody of the U.S., transportation to the U.S., and awaiting his initial appearance in this Court. Subsequent to the signing of the plea agreement, Mr. Shull has suffered a liberty loss of 68 days by being involuntarily separated from his family, home and community. During that period, Mr. Shull has either been incarcerated for 23 out of 24 hours per day or living and working under the supervision of this Court's pre-trial services office.

Mr. Shull abandoned his extradition defenses that had been successful for more than a decade in exchange for the agreed sentence set forth in the plea agreement. He did not agree to the incarceration and liberty losses that have been imposed after the agreement was signed. For this reason, Mr. Shull should be credited with these liberty losses by reducing the period of supervised release and community confinement.

## II.   THE PRESENTENCE REPORT'S GUIDELINES CALCULATION OVERSTATES THE SERIOUSNESS OF THE OFFENSE

Paragraph 4 of the plea agreement provides that Mr. Shull reserves the right to contest the 9-level upward adjustment based on an alleged gain of more than $350,000. The PSR states that the adjusted guideline level is 14. The adjusted guideline level should be at least 2 levels lower which would make the sentence much more consistent with the guidelines. According to paragraph 24 of the PSR, the gain alleged by the government was "calculated by subtracting the amounts paid for Fairmount stock purchased during each month during the relevant time period in each of the accounts controlled by the Shulls from the proceeds realized in each of those accounts from sales of Fairmount shares during the same time period." Hence, the government and the PSR attribute 100% of the stock price increase, and the resulting gain used for the guideline calculation, to illegal manipulation of demand.

In fact, paragraphs 17-21 of the PSR describe three methods or means of manipulation to artificially increase demand: (1) payments of commissions to brokers to promote the sale of Fairmount stock; (2) wash or similar trades between accounts controlled by the Shull brothers; and (3) trades at higher than the asking price at the beginning or end of a trading day. Footnote 1 on page 4 of the PSR correctly indicates that the parties dispute whether the Shulls' payments of commissions to brokers violated

the wire or securities fraud statutes. The footnote also states that the parties' agree that manipulative means other than payment of commissions to brokers provide a sufficient basis for Mr. Shull's guilty plea.

The government's assertion, recorded in paragraph 17 of the PSR, is that the Shulls and others fraudulently generated demand and thereby increased the market price for Fairmont shares by compensating brokers, and that the purchasers of the stock were unaware of the brokers' compensation. In *United States v. Skelly,* 442 F.3d 94 (2d Cir. 2006), brokers were charged and convicted based, in part, on a similar predicate. The Court stated that the brokers' failure to disclose to investors the compensation received for marketing the stock did not constitute fraudulent activity.

> Tracing back to the common law principle of *caveat emptor*, it is a fundamental tenet of Anglo-American commercial law that neither a seller nor a middleman has an obligation to disclose his financial incentives for selling a particular commodity. While the federal securities laws provide the Securities and Exchange Commission with the power to override this principle by promulgating rules that require specific disclosures, and while, pursuant to such rules, a broker/dealer like Walsh Manning must disclose to its customers the remuneration it receives for executing their trades, *see* Rule 10b-10, *17 C.F.R. § 240.10b-10*, no SEC rule requires the registered representatives who deal with the customers to disclose their own compensation, whether pegged to a particular trade or otherwise. *See United States v. Alvarado, No. 01 Cr. 156, 2001 U.S. Dist. LEXIS 21100, at \*27-28 (S.D.N.Y. Dec. 17, 2001).*
>
> Here, moreover, the indictment only charged violations of the general anti-fraud provisions of the securities laws and rules (such as *Rule 10b-5*) and the comparable provisions of the wire fraud statute. *See 18 U.S.C. §§ 1343*, *1346*. Under those provisions, a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal. Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading "half-truths" simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment.

*Id.* at 97. Of course, unlike *Skelly*, the Shulls were sellers -- not brokers. Their alleged payments to brokers were even more remote from fraudulent activity. The Shulls would

3

certainly be entitled to a *Skelly* instruction if this case was tried, and the undisclosed-payments-to-brokers theory could not be submitted to the jury. For the reasons stated by the *Skelly* court, increases in Fairmount stock price and resulting gains to Mr. Shull that are attributable to lawful commissions paid to brokers cannot properly or accurately be counted as gains resulting from illegal manipulation. Certainly, no one can accurately say that the gain in the price was not attributable to the lawful commissions to brokers. In fact, it far more likely that most, if not all, of the gain was attributable to broker promotion incentivized by lawful commissions.

For these reasons, the adjusted offense level should be at least 2 levels lower which yields a range that is more consistent with the parties' agreement than the adjusted offense level of 14 stated in the PSR.

### III.   MR. SHULL'S HEALTH AND HEALTH CARE PROBLEMS.

Paragraphs 63-65 describe Mr. Shull's long-standing, chronic and serious health problems and that these health problems are exacerbated by stress. As a Canadian who is in the U.S. involuntarily, and lacking a social security number, Mr. Shull faces substantial obstacles to obtaining the health care and expensive medications that he needs in the U.S. The longer he remains in the U.S., the greater the likelihood that he will be unable to obtain the health care that he can readily obtain in Canada.

### CONCLUSION

For these reasons, this Court should credit Mr. Shull with 68 days of post-agreement liberty loss by reducing the period of his supervised release by an equal number of days so that the period of supervise release would be 114 days rather than 162 days.

Respectfully submitted,

                        */s/ Andrew Good*
                        Andrew Good
                        BBO No. 201240
                        Good & Cormier
                        83 Atlantic Avenue
                        Boston, MA 02110
                        Tel. 617-523-5933
                        agood@goodcormier.com

### Certificate of Service

I, Andrew Good, hereby certify that I have this day served an electronic copy of the foregoing on Assistant United States Attorney Jack Pirozzolo.

      /s/  *Andrew Good*

Date: December 7, 2010

G:\CLIENTS\Shull, Robert\Pleadings\sentencing memo.doc